UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| KOLY CAMARA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>MASTRO'S RESTAURANTS LLC,<br><br>Defendant. | Civil Action No. 18-724 (JEB) |

## MEMORANDUM OPINION

From 2015 to 2017, Plaintiff Koly Camara worked as a server at Defendant Mastro's Steakhouse here in Washington. He subsequently brought this lawsuit, alleging that the company's manner of paying its servers violated the Fair Labor Standards Act and the D.C. Minimum Wage Revision Act. His allegations focus on Defendant's use of a so-called "tip credit" — a method of compensation in which an employer pays its employees a base wage below the minimum level set by law; this is permissible so long as the employees' tips ultimately bring their wages up to the minimum. Here, however, Plaintiff claims that Mastro's violated the law by employing a tip-credit system while requiring servers to share tips with employees — *e.g.*, wine runners and baristas — who did not "customarily and regularly receive tips." 29 U.S.C. § 203(m)(2)(A). In this opening salvo, Defendant moves to compel arbitration and for dismissal, and Plaintiff moves for conditional certification of a collective action under the FLSA and the DCMWRA. Finding merit in Plaintiff's arguments on both issues, the Court denies Defendant's Motion and grants Plaintiff's.

I.     **Background**

The Court starts by describing the legal framework that applies to Plaintiff's lawsuit and then explains the factual and procedural background of this case.

A.   <u>Legal Background</u>

For a good while now, federal and local law have required employers to pay their employees a minimum wage.  <u>See</u> Fair Labor Standards Act of 1938 § 6, 29 U.S.C. § 206; District of Columbia Minimum Wage Revision Act of 1992, D.C. Code § 32-1003.  Currently, the federal minimum wage is $7.25 an hour, while D.C.'s stands at $13.25.  <u>See</u> 29 U.S.C. § 206(a)(1)(C); D.C. Code § 32-1003(a)(5)(A)(iii).

These laws make special provision for "tipped employees" — *viz.*, employees who "customarily and regularly receive more than $30 a month in tips."  29 U.S.C. § 203(t).  Employers may pay such employees a lower base hourly wage on the understanding that their tips will bring their total wage up to the minimum.  Federal law now requires a base wage of $2.13; D.C. law $3.89.  <u>See</u> 29 U.S.C. § 203(m)(2)(A); D.C. Code § 32-1003(f)(1)(C); <u>see also</u> 123 Am. Jur. <u>Trials</u> 1, § 8 (Sept. 2018).  If an employee's tips do not make up the difference between the base and minimum wages, the employer must pay the difference.  <u>See</u> 29 U.S.C. § 203(m)(2)(A); D.C. Code § 32-1003(f)(1).  As mentioned at the outset, this arrangement is known as a tip credit.

An employer may only avail itself of the tip credit if it informs its employees of the arrangement and allows them to retain all of their tips, except that an employer may require employees to pool their tips with other employees who "customarily and regularly receive tips." <u>See</u> 29 U.S.C. § 203(m)(2)(A).  This exception for tip pooling is at the heart of this case.  To determine whether an employee customarily and regularly receives tips, so as to allow her to

share in another's tips, courts typically look to "the extent of an employee's customer

interaction." Montano v. Montrose Rest. Assocs., Inc., 800 F.3d 186, 192–93 (5th Cir. 2015).  If

an employer keeps an employee's tips or requires an employee to share tips with non-tipped

employees, it loses the ability to invoke the tip credit.  See 29 U.S.C. § 203(m)(2)(A); see also

Montano, 800 F.3d at 189 & n.6; Ventura v. Bebo Foods, Inc., 738 F. Supp. 2d 1, 7 (D.D.C.

2010).  Employees may sue to recover underpaid wages in violation of these requirements under

the Fair Labor Standards Act and the D.C. Minimum Wage Revision Act.

B.  Factual Background

Given the stage of the proceedings, the Court recites the facts in the light most favorable

to Plaintiff.  See Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc., 531 F.3d 863, 865 (D.C. Cir.

2008) (applying summary-judgment standard to motion to compel arbitration); Dinkel v.

MedStar Health, Inc., 880 F. Supp. 2d 49, 52 (D.D.C. 2012) (explaining that at conditional-

certification stage plaintiffs need only offer "modest factual showing" and that court should

refrain from resolving factual disputes) (quoting Myers v. Hertz Corp., 624 F.3d 537, 555 (2d

Cir. 2010)).

Plaintiff worked as a server at Mastro's in D.C. from the summer of 2015 to November

2017.  See ECF No. 1 (Compl.), ¶ 16.  During his time there, the company compensated Camara

and other servers like him using a tip credit, paying them a base hourly wage below the federal

minimum with servers' tips credited against the remainder of the minimum.  Id., ¶¶ 17–18.  At

the same time, Mastro's required servers to pool more than 40% of their tips with other

employees like wine runners, food runners, and baristas.  Id., ¶ 19.  Certain of those employees,

according to Plaintiff, did not regularly and customarily interact with customers.  Id., ¶¶ 20–23.

Wine runners, for instance, "spend almost all their time working in or near the restaurant's wine

cellar and have little to no interaction with restaurant customers." Id., ¶ 21. And baristas "spend almost all their time working in or near the kitchen and have no interaction with restaurant customers." Id., ¶ 23. (Defendant disputes Plaintiff's allegations about wine runners and baristas, see ECF No. 18 (Def. Opp.), Exh. A (Declarations), but its disagreements are left for another day in light of the posture of the case.)

    C. <u>Procedural Background</u>

Plaintiff filed this lawsuit against Mastro's on May 25, 2018. See Compl. He alleges that it violated the FLSA and the DCMWRA when it paid servers using a tip credit while requiring them to share tips with some employees who do not ordinarily receive tips. Id., ¶¶ 40–42, 48. Although not at issue in these Motions, Camara also appears to argue that Mastro's violated the DCMWRA by failing to pay him for overtime work and the D.C. Wage Payment and Wage Collection Law for similar reasons. Id., ¶¶ 28–29, 47, 50–57.

Both parties now seek the Court's intervention. Defendant has filed a Motion to Compel Arbitration and for Dismissal. See ECF No. 17. It asserts that Plaintiff previously signed a binding arbitration agreement and that the Court should therefore compel arbitration and dismiss the case. Id. Plaintiff has simultaneously filed a Motion for Notice to Similarly Situated Persons, which the Court refers to as a Motion for Conditional Certification of a Collective Action. See ECF No. 14. Based on his factual allegations and declarations from servers at other Mastro's locations around the country, he asks the Court to certify under the FLSA and DCMWRA (limited to D.C. servers) a collective action of "[a]ll employees who worked as servers and received an hourly wage less than $7.25 an hour at any Mastro's location in the United States from May 22, 2015 to the present." ECF No. 21 (Pl. Reply) at 2 (emphasis omitted).

## II.     Analysis

As a threshold issue, the parties debate which Motion the Court should address first. Defendant insists that it should start with the Motion to Compel Arbitration because its resolution could moot Plaintiff's Motion.  See Def. Mot. at 10–12.  Plaintiff rejoins that the Court should rule first on its Motion for Conditional Certification.  See Pl. Reply. at 5.  Since the Court denies Defendant's Motion, it does not matter in which order the issues are addressed.  In any event, the Court believes it simpler to begin with arbitration before moving on to conditional certification.

### A.  Arbitration

Defendant asks the Court to compel arbitration under the Federal Arbitration Act and dismiss the case.  The Court starts with the applicable legal standard and then turns to the merits.

#### 1.  *Legal Standard*

The Federal Arbitration Act provides that certain arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The Act "is a congressional declaration of a liberal federal policy favoring arbitration agreements."  Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983).  Courts must therefore "'rigorously enforce' arbitration agreements according to their terms."  Am. Express Co. v. Italian Colors Rest., 570 U.S. 228, 233 (2013) (quoting Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 221 (1985)).

The Act comes into play, however, only when there is an enforceable arbitration agreement.  Id. ("[A]rbitration is a matter of contract.").  "Accordingly, the first task of a court asked to compel arbitration . . . is to determine whether the parties agreed to arbitrate that dispute."  Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985).

In undertaking that inquiry, "the appropriate standard of review for the district court is the same standard used in resolving summary judgment motions pursuant to Fed. R. Civ. P. 56(c)." Brown v. Dorsey & Whitney, LLP, 267 F. Supp. 2d 61, 67 (D.D.C. 2003) (internal quotation marks and citation omitted); see also Aliron, 531 F.3d at 865. "As the party seeking to compel arbitration, Defendant[] must first come forward with evidence sufficient to demonstrate an enforceable agreement to arbitrate." Hill v. Wackenhut Servs. Int'l, 865 F. Supp. 2d 84, 89 (D.D.C. 2012) (internal quotation marks and citation omitted). The burden then shifts to Plaintiff "to raise a genuine issue of material fact as to the making of the agreement, using evidence comparable to that identified in Fed. R. Civ. P. 56." Id.; see also Booker v. Robert Half Int'l, Inc., 315 F. Supp. 2d 94, 99 (D.D.C. 2004).

A brief refresher on the Rule 56 standard. A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). When a motion for summary judgment is under consideration, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006). The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). In ruling on a

motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

    2. *Analysis*

The central question for the Court is whether Plaintiff agreed to be bound by the arbitration agreement Defendant attaches to its Motion or one substantially identical to it. See Def. Mot., Exh. A (Arbitration Agreement). The parties agree that this question is governed by D.C. contract law and resolved under the summary-judgment standard discussed above. But that's about all they agree on. Mastro's insists that Plaintiff assented to the arbitration agreement, even though it cannot produce a document bearing his signature. See Def. Mot. at 6–10. Plaintiff, on the other hand, attests that he never saw the agreement, never signed it, and never otherwise agreed to arbitrate any disputes he might have with Mastro's. See ECF No. 23 (Pl. Opp.), Exh. 1 (Declaration of Koly Camara), ¶ 3.

The Court starts by considering whether Mastro's has met its initial burden of showing that Camara assented to an arbitration agreement. Finding that to be the case, the Court then considers whether Plaintiff has offered evidence creating a genuine dispute of material fact as to the issue of his agreement. Concluding that he has, the Court need not consider his back-up argument that any agreement is unenforceable as a matter of D.C. law.

    a.   Defendant's Evidence

Mastro's musters the following evidence that Plaintiff agreed to pursue any claims against it only in arbitration. First, it declares that since June 2015, "it has been Defendant's policy to require all employees to execute" arbitration agreements like the one attached to its Motion. See Def. Mot., Exh. B (First Declaration of Laura Jasso), ¶ 4. Consistent with that policy, it says that "virtually every Washington, D.C. Mastro's employee has signed an

individual Arbitration Agreement." Def. Mot., Attach. 1 (Declaration of Stephen Carcamo), ¶ 3.

Mastro's reasons that, because it required employees to sign such agreements and most

employees did sign such agreements, Plaintiff must also have signed one. See Def. Mot. at 4, 7.

Second, Mastro's internal database that tracks compliance with the company's arbitration policy

shows that Plaintiff signed an arbitration agreement. See First Jasso Decl., ¶ 7. Third, Mastro's

suggests that Camara impliedly agreed to arbitration by continuing to work at the restaurant after

the arbitration program was rolled out. See ECF No. 25 (Def. Reply) at 3–8.

This evidence satisfies Defendant's initial burden of showing that Plaintiff assented to an

arbitration agreement. Taken together, the company's general arbitration policy and its internal

data could lead a reasonable jury to find that he agreed to arbitrate disputes with Mastro's. The

burden thus shifts to Camara to show a genuine dispute of material fact.

b.   Plaintiff's Evidence

Camara contests Defendant's position on each front, contending that he never expressly

or impliedly agreed to arbitrate disputes with Mastro's. As to the question of express agreement,

he declares under penalty of perjury that he "did not see [the arbitration] agreement when [he]

worked at Mastro's, did not sign it, and [] never agreed to its terms." Camara Decl., ¶ 3. Even

though it has found and produced arbitration agreements signed by other employees, see Def.

Reply, Exhs. A & B, Mastro's has been unable to locate any for Camara. See Carcamo Decl.,

¶ 8. Neither has it offered evidence of any specific communication between the restaurant and

Plaintiff concerning the agreement.

This is a prototypical dispute of fact. On the one side is Camara's sworn statement that

he never saw, signed, or otherwise assented to an arbitration agreement. On the other is Mastro's

general arbitration policy and the notation by an unnamed manager in an internal database. And

that dispute is material insofar as it determines whether the parties had a meeting of the minds as to an arbitration agreement.

Defendant's only possible rejoinder is that the dispute is not <u>genuine</u> — *i.e.*, that no reasonable jury could side with Camara on this question.  <u>See</u> Def. Reply at 6.  In that vein, the company states that Camara fails to "support his assertions with 'affidavits, declarations, or other competent evidence.'"  <u>Id.</u> (quoting <u>Wackenhut</u>, 865 F. Supp. 2d at 89).  This argument would have been better left in the meat locker.  Camara submitted a <u>sworn declaration</u> specifically denying that he had signed an arbitration agreement; the declaration is competent and persuasive evidence on the question of his assent.  When faced with a specific and sworn denial on the one hand, and an internal company directive and the absence of a signed contract on the other, a reasonable jury would have good reason to side with Camara.  The dispute over whether Plaintiff expressly assented to arbitrate disputes with Mastro's is therefore genuine.

Yet Defendant also maintains that Camara <u>impliedly</u> agreed to arbitration.  In support of this position, the steakhouse looks to the Supreme Court's recent decision in <u>Epic Systems Corp. v. Lewis</u>, 138 S. Ct. 1612 (2018).  There, the Court held that the National Labor Relations Act did not affect the enforceability of arbitration agreements in employment contracts.  <u>Id.</u> at 1619.  Mastro's extracts from the decision an additional holding: that employees impliedly agree to binding arbitration when they remain in their position after receiving notice of their employer's new arbitration policy.  <u>See</u> Def. Reply at 6–7.  Defendant reasons that Camara should be found to have done the same.  Once again, the Court disagrees: Mastro's chars both <u>Epic</u> and its purported application to this case.

To start, <u>Epic</u> did not decide any question about the formation of arbitration agreements by implied assent.  It is true that Justice Ginsburg noted in dissent her concern that the arbitration

agreement in one of the underlying cases was not properly formed because it was not bilateral. See 138 S. Ct. at 1636 n.2. But the implied-assent issue was not before the Court, which took as a given that the plaintiffs had agreed to pursue their claims in arbitration. See Petition for Writ of Certiorari for Defendant-Appellant, Epic Sys. Corp. v. Lewis, 138 S. Ct. 1612 (2016) (No. 16-285) (limiting question presented to whether an arbitration agreement is enforceable notwithstanding the NLRA); Brief in Opposition to Certiorari for Plaintiff-Appellee, id. (declining to expand question presented or cross-petition for review). Of course, a decision "is not a binding precedent" on an issue not pressed by the parties or passed on by the Court. See United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 38 (1952); see also Waters v. Churchill, 511 U.S. 661, 678 (1994) (explaining that past decisions "cannot be read as foreclosing an argument that they never dealt with").

Even if Mastro's were right that Epic made new law on what constitutes an arbitration agreement, that decision would offer little aid. In Epic, as mentioned, the plaintiff received an email telling him that if he continued working there, he would be deemed to have accepted an arbitration agreement. No such email apparently exists in this case, nor is it clear that a comparable message could have been sent, since Camara may have begun working for Mastro's contemporaneously with the rollout of the arbitration policy. The upshot: Mastro's offers no evidence that Plaintiff was aware of the arbitration agreement, and Camara avers that he was not. Implied assent would come into play only if the employee were aware (or, at a minimum, constructively aware) that his continued employment would have as a consequence an agreement to arbitrate. See Restatement (Second) of Contracts § 19(2) (1981) ("The conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents.");

<u>Nicosia v. Amazon.com, Inc.</u>, 834 F.3d 220, 232 (2d Cir. 2016) (holding that party only bound to arbitration agreement if she had "notice of [its] existence"); <u>see also</u> <u>Bailey v. Fed. Nat'l Mortg. Ass'n</u>, 209 F.3d 740, 746 (D.C. Cir. 2000) (explaining that parties must manifest a "distinct intention to be bound" by agreement).  Plaintiff has introduced evidence to the contrary, so there is, at the very least, a genuine dispute of material fact over whether he impliedly assented to any arbitration agreement.

One final note of caution to Defendant on this issue.  In its Reply Brief, the company makes the following statement:

> Here, Plaintiff agreed to submit his claims to arbitration because he saw the "agreement when [he] worked at Mastro's," signed it, and had "reason to believe," that he agreed to arbitrate any claims through his continued employment with Mastro's.  (*See* Pl's Br. (ECF No. 23) at 3.)

Def. Reply at 4.  The statement quotes Plaintiff's brief to suggest that he saw and signed the arbitration agreement.  Yet the quoted sections of Plaintiff's brief say precisely the opposite.  <u>See</u> Pl. Opp. at 3 (emphasizing that plaintiff "did not see that agreement" and "did not sign it") (quoting Camara Decl., ¶ 3).  Parties must be careful not to misrepresent the assertions and arguments of their opponent, particularly on such a fundamental point.  The Court trusts such errors will not recur.

*     *     *

As there is a genuine dispute of material fact over whether Plaintiff agreed to pursue all claims against Mastro's through arbitration, the Court will deny the Motion to Compel Arbitration.  In doing so, it notes that Defendant has also challenged on similar grounds the presence in this case of other servers who have filed notices to become party Plaintiffs.  <u>See</u> ECF No. 28 (Def. Surreply).  Since the action will continue with Camara as named Plaintiff and given

that briefing has hardly been had as to the new party Plaintiffs, the Court will not address at this point whether those other servers must go to arbitration.  Defendant can raise the matter down the road.

B. Conditional Certification

Not satisfied with suing only for his own benefit, Plaintiff also seeks to litigate his Fair Labor Standards Act and D.C. Minimum Wage Revision Act claims on behalf of others who are similarly situated.  He thus moves the Court to enter an order providing notice of the action to "[a]ll employees who worked as servers and received an hourly wage less than $7.25 an hour at any Mastro's location in the United States from May 22, 2015 to the present."  Pl. Reply at 2.  The DCMWRA claim, needless to say, is restricted to servers in the District of Columbia.

1. *Legal Standard*

Employees who assert violations of the FLSA's and DCMWRA's minimum-wage provisions may bring actions on their own behalf and that of "other employees similarly situated" in a collective action.  See 29 U.S.C. § 216(b); see also D.C. Code § 32-1308(a)(1)(C).  "This unique cause of action . . . is not subject to the numerosity, commonality, and typicality rules of a class action under Rule 23."  Hunter v. Sprint Corp., 346 F. Supp. 2d 113, 117 (D.D.C. 2004); see also Castillo v. P & R Enterprises, 517 F. Supp. 2d 440, 444 (D.D.C. 2007).

 Although the D.C. Circuit has not yet spoken on the issue, "[c]ourts in this Circuit and others have settled on a two-stage inquiry for determining when a collective action is appropriate" under the FLSA.  Dinkel v. MedStar Health, Inc., 880 F. Supp. 2d 49, 52 (D.D.C. 2012).  Courts have applied the same two-stage analysis to certification decisions under the DCMWRA.  See Stephens v. Farmers Restaurant Group, 291 F. Supp. 3d 95, 105–06 (D.D.C.

2018); Castillo, 517 F. Supp. 2d at 445 n.3.  As the parties assume the standards are the same, see Pl. Mot. at 14–15 & Def. Opp. at 26 n.5, this Court follows suit.

At the first stage, "the court mak[es] an initial determination to send notice to potential opt-in plaintiffs who may be 'similarly situated' to the named plaintiffs with respect to whether a FLSA violation has occurred."  Myers v. Hertz Corp., 624 F.3d 537, 555 (2d Cir. 2010) (emphasis added) (citations omitted); see also Dinkel, 880 F. Supp. 2d at 52–53 (collecting cases).  This stage requires only a "modest factual showing sufficient to demonstrate that [named] and potential plaintiffs together were victims of a common policy or plan that violated the law."  Chase v. AIMCO Props., L.P., 374 F. Supp. 2d 196, 200 (D.D.C. 2005). "Such a showing, as an initial matter, satisfies the FLSA requirement that putative class members be similarly situated to the plaintiffs, . . . and is ordinarily based mostly on the parties' pleadings and affidavits."  Encinas v. J.J. Drywall Corp., 265 F.R.D. 3, 6 (D.D.C. 2010) (internal quotations omitted); see also Mooney v. Aramco Servs. Co., 54 F.3d 1207, 1214 n.8 (5th Cir. 1995), overruled on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003).  If a plaintiff can make this showing, a court will conditionally certify the class.  While the Court uses the term "conditional certification" in this Opinion, the certification is nothing more than "the district court's exercise of the discretionary power . . . to facilitate the sending of notice to potential class members."  Myers, 624 F.3d at 555 n.10.  At the second stage, defendants may move at the close of discovery to decertify the conditional class if the record establishes that the plaintiffs are not, in fact, similarly situated.  See Castillo, 517 F. Supp. 2d at 445.

The bar for a plaintiff at the first stage of the process is not high.  See, e.g., Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1261 (11th Cir. 2008) (describing plaintiff's burden as "not particularly stringent," "fairly lenient," "flexible," and "not heavy") (internal quotation

marks and citations omitted); Dinkel, 880 F. Supp. 2d at 52 (describing "a low standard of proof because the purpose of this first stage is merely to determine whether 'similarly situated' plaintiffs do in fact exist") (internal citations omitted); McKinney, 585 F. Supp. 2d at 8 ("The court employs a lenient standard in making this determination.").  Indeed, all that is needed is "some evidence, 'beyond pure speculation,' of a factual nexus between the manner in which the employer's alleged policy affected [a plaintiff] and the manner in which it affected other employees."  Symczyk v. Genesis HealthCare Corp., 656 F.3d 189, 193 (3d Cir. 2011) (internal citation omitted), rev'd on other grounds, 569 U.S. 66 (2013).  "Plaintiffs need show only that their positions are similar, not identical, to the positions held by the putative class members." Grayson v. K Mart Corp., 79 F.3d 1086, 1096 (11th Cir. 1996) (internal quotation marks and citation omitted).  During the second stage, a court's inquiry is typically more searching.  See, e.g., Lockhart v. Westinghouse Credit Corp., 879 F.2d 43, 51 (3d Cir. 1989) (at second stage, courts examine whether all putative class members "(1) [were] employed in the same corporate department, division and location; (2) advanced similar claims . . . ; and (3) sought substantially the same form of relief"), overruled on other grounds by Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089 (3d Cir. 1995).

2. *Analysis*

The question of conditional certification in this case turns on whether Plaintiff is similarly situated to other Mastro's servers who were paid a base hourly wage below the federal minimum.  The Court first addresses Camara's allegation on this point before turning to Defendant's arguments about the various differences between Plaintiff and other Mastro's servers.  After explaining why it finds conditional certification appropriate, the Court last addresses a separate issue related to the scope of notice to putative Plaintiffs.

a.   Plaintiff's Showing

Camara says that other servers are subject to the same unlawful employment practices he challenges in this case, and that they are thus similarly situated to him.  In particular, he says that Mastro's maintained (1) "a common policy and practice of paying the hourly tipped minimum wage to servers"; (2) "a common policy and practice of requiring servers to put approximately 42–45% of the tips they received into a 'tip pool' to be shared with other employees including wine runners, food runners, bartenders, bussers, and baristas"; and (3) "a common policy and practice of certain participants in the tip pool not having customary and regular interaction with restaurant customers as part of their job duties."  Pl. Mot. at 10.  He backs those allegations up with sworn declarations from servers at a number of different Mastro's locations around the country.  See, e.g., Pl. Mot., Attachs. 2–5 (Server Declarations).  The Court finds, as a result, that Plaintiff has easily made the "modest factual showing sufficient to demonstrate that [named] and potential plaintiffs together were victims of a common policy or plan that violated the law." Chase, 374 F. Supp. 2d at 200.

b.   Defendant's Objections

Defendant's principal objection to certification appears to be its position that it does not in fact maintain an unlawful tip pool.  See Def. Opp. at 2–12 (taking issue with Plaintiff's factual allegations).  It attaches to its Opposition numerous declarations of other Mastro's servers to that effect.  Id., Exh. A.  For example, it submits a declaration from Sebastian Acosta, a server at its New York City location, who states that wine runners do interact routinely with customers.  Id. (Declaration of Sebastian Acosta), ¶ 6.  It also offers a declaration from server Erin Berryhill at its D.C. restaurant, who avers that wine runners and server assistants regularly interact with customers there.  Id. (Declaration of Erin Berryhill), ¶¶ 4–7.

15

This argument and these declarations offer little meat.  At the conditional-certification stage, district courts are advised to "refrain from resolving factual disputes and deciding matters going to the merits."  <u>Freeman v. MedStar Health Inc.</u>, 187 F. Supp. 3d 19, 23 (D.D.C. 2016); <u>see also</u> <u>Dinkel</u>, 880 F. Supp. 2d at 53 (explaining that named plaintiffs need only present "some evidence, beyond pure speculation, of a factual nexus between the manner in which the employer's alleged policy affected them and the manner in which it affected other employees").  All Mastro's declarations do is dispute Plaintiff's allegations on the merits.  Acosta's declaration, for example, merely contradicts a declaration Plaintiff submitted from Daniel Pena.  <u>See</u> Pl. Mot., Attach. 3 (Declaration of Daniel Pena), ¶ 4.  Pena says that wine runners in the New York location "had little or no interaction with restaurant customers."  <u>Id.</u>  Berryhill's declaration does the same for Camara's own allegations about the D.C. restaurant.  <u>See</u> Compl., ¶¶ 20–23.  Such factual disputes are left for another day.

Mastro's remaining briefing is somewhat scattershot, but it appears to identify three purported differences between Camara and other servers that preclude conditional certification, none of which the Court finds persuasive.

(i).  It first suggests that Camara is not similarly situated with servers at Mastro's other restaurant locations.  <u>See</u> Def. Opp. at 11, 16, 19.  The only differences it points out, however, are (1) the percentage of servers' tips placed in the tip pool (from 40 to 50% depending on location), and (2) the level of interaction wine runners and baristas have with customers.  <u>Id.</u> at 16–18.  The first difference is immaterial to conditional certification and the second is illusory.

In asserting that the differences in the percentage of tips placed in the tip pool preclude certification, Mastro's forgets that Plaintiff needs "show only that [his] position[] [is] similar, not identical, to the positions held by the putative class members."  <u>Grayson</u>, 79 F.3d at 1096.  A

minor difference in tip-pool percentage thus does not make conditional certification inappropriate.  In fact, as far as the Court can tell, the particular percentage of tips placed in the pool does not even affect whether Mastro's violated the FLSA or the DCMWRA — it matters only in calculating damages.  The Supreme Court has upheld the certification of classes — a higher bar than collectives — with far more wide-ranging and difficult damages calculations. See Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1046–47 (2016) (approving use of representative sample for purposes of proving classwide liability and calculating damages).

As to the interaction between wine runners and customers, Mastro's fixates on what it says are "gross" inconsistencies among three of Plaintiff's declarations that it says show that servers are not similarly situated.  See Def. Opp. at 16–18.  Here's what the declarations said: Pena, the New York server, averred that servers would retrieve wine from wine runners "at a meeting point outside of the view of customers."  Id. at 17 (quoting Pena Decl., ¶ 4).  Mary Still, a Chicago server, declared that servers obtain wine from wine runners at "a meeting point outside of the view of customers, such as near the point of sales system or the main bar."  Id. (quoting Mary Still Decl., ¶ 4).  Cory Warfield, also in Chicago, stated that servers get wine from wine runners at a "meeting point 'like the bar or the point of sales terminal.'"  Id. at 18 (quoting Cory Warfield Decl., ¶ 5).  Mastro's asserts that the declarations are inconsistent — e.g., the bar is within the view of customers — and thus show that servers across locations are not similarly situated.  See Def. Opp. at 17–18.

This argument is not ready to come of the grill.  Even if the particular meeting point were different in New York from Chicago and D.C. and even if customers might see wine runners near the bar, that would be consistent with declarants' (and Plaintiff's) averment that wine runners in all locations did not regularly interact with customers.  The declarations thus fully support

Plaintiff's allegation that servers at Mastro's restaurants nationwide, like Camara in D.C.,

participate in a tip pool that includes employees who do not regularly interact with customers.

More generally, Defendant's attacks on the servers' credibility are misdirected, for "the Court

does not resolve factual disputes, decide substantive issues going to the ultimate merits or <u>make</u>

<u>credibility determinations</u>" at this stage of the proceedings.  <u>Summa v. Hofstra Univ.</u>, 715 F.

Supp. 2d 378, 384 (E.D.N.Y. 2010) (emphasis added) (citation omitted).

Before moving on, it is worth noting what arguments Mastro's does <u>not</u> make about its

different restaurant locations.  The company does not maintain, for example, that its restaurants

are independently run or that they maintain varying employment and personnel practices.  Just

the opposite.  It describes all Mastro's restaurants as adhering to the same "approach to service,"

which focuses on using a team of employees to address customers' needs.  <u>See</u> Def. Opp. at 4;

<u>id.</u>, Attach. 2 (Second Declaration of Laura Jasso), ¶ 6.  When discussing the question of

arbitration, it likewise affirms that the company's employment policies extend to its restaurants

nationwide.  <u>Id.</u> at 24–25.  Such national policies, of course, make it more difficult for Mastro's

to claim that differences among its restaurants preclude conditional certification.

(ii).  Defendant next asserts that Camara is not similarly situated to other servers who

<u>have</u> signed arbitration agreements.  The Court concludes that any difference among putative

collective members as to arbitration agreements does not defeat the Motion.

The majority of district courts to have addressed the issue have determined that the fact

that some employees "have signed arbitration agreements does not preclude conditional

certification" as to all employees.  <u>See</u> <u>Maddy v. General Elec. Co.</u>, 59 F. Supp. 3d 675, 685 n.7

(D.N.J. 2014); <u>Romero v. La Revise Assocs., LLC</u>, 968 F. Supp. 2d 639, 646–47 (S.D.N.Y. 2013)

("The arbitration agreements do not create any differences between [named plaintiff] and the

proposed plaintiffs with respect to claims that defendants have violated the FLSA.  That is, the

validity *vel non* of the agreements is unrelated to any claims of a violation of the FLSA.  Under

this reasoning, the existence of differences between potential plaintiffs as to the arbitrability of

their claims should not act as a bar to the collective action analysis."); see also, e.g., Garcia v.

Chipotle Mexican Grill, Inc., 2016 WL 6561302, at *9 (S.D.N.Y. Nov. 4, 2016) ("[I]ssues of fact

surrounding arbitration agreements are properly resolved at the second stage of the two-step

inquiry."); Taylor v. Pilot Corp., 2016 WL 4524310, at *3 (W.D. Tenn. Mar. 3, 2016); but see

Longnecker v. Am. Express Co., 2014 WL 4071662, at *7 (D. Ariz. Aug. 18, 2014) (concluding

to the contrary); Fischer v. Kmart Corp., 2014 WL 3817368, at *7 (D.N.J. Aug. 4, 2014) (same).

The Court is persuaded by the decisions of the majority of courts.  At least in the

circumstances of this case, in which the named Plaintiff has not signed an arbitration agreement

and questions of fact remain about the existence and validity of other arbitration agreements, the

Court will not prematurely limit the dissemination of notice.  See Dinkel, 880 F. Supp. 2d at 52

(noting that "district courts have considerable discretion in managing the process of joining

similarly situated employees in a manner that is both orderly and sensible"); see also Myers, 624

F.3d at 555 n.10 (explaining that conditional certification is case-management tool within district

court's discretion).  After discovery, the Court may decide to exclude servers who have signed

arbitration agreements from this action or separate them into a different collective.  See Krstic v.

J.R. Contracting & Envtl. Consulting, 2011 WL 1042732, at *7 (D.N.J. Mar. 16, 2011).  That is

what the second stage of certification proceedings is typically for.  See Symczyk, 656 F.3d at 193

(explaining that court at second stage must make "conclusive determination as to whether each

plaintiff who has opted in to the collective action is in fact similarly situated to the named

plaintiff").  For now, in showing that he "and potential plaintiffs together were victims of a

common policy or plan that violated the law," <u>Chase</u>, 374 F. Supp. 2d at 200, Camara has done all he is required to do.

(iii).  Finally, Mastro's suggests that individual factual determinations as to liability preclude conditional certification.  <u>See</u> Def. Mot. at 12.  The only individual factual determinations it mentions, though — apart from those already discussed — center around the duties of wine runners and baristas.  Its concern in that respect is overdone.  Because Plaintiff is a server and seeks only to represent other servers, variations among other Mastro's employees only matter to the extent they affect the restaurant's liability as to servers.  And, variations among wine runners and baristas <u>within</u> one restaurant will not affect Mastro's liability as to servers under the FLSA and DCMWRA: If a single wine runner or barista does not regularly interact with customers but joins a location's tip pool, Mastro's will presumably have contravened the Acts.  Neither do such intra-restaurant variations appear to matter for purposes of calculating damages, which do not depend on individual facts about non-tipped employees. <u>See</u> <u>Montano v. Montrose Restaurant Assocs., Inc.</u>, 800 F.3d 186, 189 & n.6 (5th Cir. 2015) (noting that damages would be equal to difference between base wage and minimum wage plus amount of tips plaintiff contributed to unlawful tip pool).

While one might imagine that wine runners' and baristas' duties could vary <u>among</u> different restaurants, thus requiring factual determinations about Mastro's liability to servers by location, the Court has already explained why any such variations are illusory.  <u>See</u> *supra* at 16– 18.  Indeed, the steakhouse has affirmed that it takes the same approach to service in all of its restaurants.  <u>See</u> Second Jasso Decl., ¶ 6.  Because Defendant fails to identify any other differences among servers that would require individual adjudication, the Court rejects its

conclusory assertion that the need for individual factual determinations precludes conditional certification.

### c.   Notice

The only remaining issues concern the scope of notice to putative collective members.

First, Mastro's briefly asserts that notice should not issue to servers in all of its restaurants in the United States because it "does not own or operate all Mastro's restaurant locations in the United States."  Def. Opp. at 9.  It is not entirely clear what Defendant is arguing on this score.  Insofar as Mastro's suggests that servers at certain restaurants are not "employed" by Defendant, such that it would not be liable for any FLSA or DCMWRA violations, such questions are properly addressed at the second stage of certification.  See, e.g. Rivera v. Power Design, Inc., 172 F. Supp. 3d 321, 327 (D.D.C. 2016) (collecting cases).  Plaintiff has offered sufficient unrebutted evidence that Mastro's employs servers at all of its locations to satisfy the "modest showing that plaintiffs must make at the conditional certification stage."  Id.  To the extent it means that servers at the Mastro's locations it supposedly does not own or operate are not similarly situated to servers like Camara who work at a location it does own and operate, that assertion flies in the face of its declaration that all its restaurants take the same approach to service.  See Second Jasso Decl., ¶ 6.  Finally, insofar as Mastro's disputes its ability to facilitate such notice, the Court is unpersuaded.  Defendant has obtained declarations from employees at the locations it suggests it does not fully own or operate — viz., the Chicago and Pittsburgh locations — and seeks to enforce arbitration agreements involving employees at those locations. See Second Jasso Decl., ¶¶ 8–10.  The company thus has enough control over those restaurants to obtain putative Plaintiffs' contact information and provide it to Camara in this action.  Cf.

Rivera, 172 F. Supp. 3d at 330 (rejecting defendants' argument that they should not be required to provide putative Plaintiffs' contact information because it was in the hands of a subcontractor).

Second, Mastro's argues that it should not be required to disclose putative Plaintiffs' social-security numbers or phone numbers.  See Def. Opp. at 26–27.  When deciding whether to require disclosure of potential plaintiffs' information, courts balance "plaintiffs' need" for the information "against the privacy interests of the current and former employees."  Gieseke v. First Horizon Home Loan, 2007 WL 445202, at *3 (D. Kan. Feb. 7, 2007).  Upon consideration of that balance, the Court agrees that disclosure of social-security numbers is unnecessary at this stage of the proceedings because it could compromise putative Plaintiffs' privacy without any countervailing benefit.  See Delaney v. Geisha NYC, LLC, 261 F.R.D. 55, 60 (S.D.N.Y. 2009). (Even Camara concedes in his Reply that such information is not necessary at this point.  See Pl. Reply at 15.)  Telephone numbers are a different matter.  While this information is private, it does not pose the same confidentiality concerns as social-security numbers; it is also highly useful in contacting putative Plaintiffs.  Because "Defendant[] raises no special concerns" about disclosing this information, the Court finds that "the balance favors requiring Defendant[] to provide phone numbers."  Ayala v. Tito Contractors, 12 F. Supp. 3d 167, 172 (D.D.C. 2014). Mastro's does not contest Plaintiff's other discovery requests associated with providing notice, including its request for email addresses, mailing addresses, and employment IDs.  See Pl. Mot. at 13.  The Court, accordingly, need not question the propriety of such disclosures.

The Court will therefore order notice of this action be provided consistent with this Opinion to "[a]ll employees who worked as servers and received an hourly wage less than $7.25 an hour at any Mastro's location in the United States from May 22, 2015 to the present."  Pl. Reply at 2.  In connection with this Notice, Defendant shall provide Plaintiff with the full names,

telephone numbers, mailing addresses, email addresses, and employee IDs for all putative

Plaintiffs.  As both parties agree, the notice period shall be sixty days.

## III.    Conclusion

For the reasons given in this Opinion, the Court will deny Defendant's Motion to Compel

Arbitration and grant Plaintiff's Motion for Conditional Certification of a Collective Action

under the FLSA and DCMWRA.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  October 24, 2018